## RUGELY, BLAIR & CO. *v.* SUN MUTUAL INSURANCE COMPANY OF NEW YORK.

If a ship, soon after sailing, becomes so leaky as to be unable to proceed on her voyage, and this cannot be ascribed to stress of weather or accident on the voyage, the fair and natural presumption is, that the disability arose from causes existing before setting out on her voyage, and consequently that she was not seaworthy when she sailed. In such cases, therefore, it is incumbent on the assured to show that, at the time of her departure, she was in fact seaworthy, and that her inability arose subsequent to the commencement of the voyage.

In case of shipwreck, where the cargo is in condition to reship, and where the means of transportation can be procured within a reasonable time, the master has no legal right to sell; it is his duty to forward the cargo to its port of destination.

Where there is a legal justification for the master to sell the cargo, yet it is his duty to give such notice, as will warn the public of the time and manner of the sale.

If in case of shipwreck, the reshipment of the cargo is proper and practicable, and if, instead of forwarding, the master sell it, the insured cannot abandon and claim for a total, but may recover for a partial loss.

APPEAL from the Fifth District Court of New Orleans, *Buchanan,* J. *Roselius,* and *Benjamin* and *Micou,* for plaintiffs.

*J. A. Maybin,* for defendants. Where the vessel is lost or disabled, and the cargo is saved, and the master has the means and power of transhipping and sending on the cargo, a loss, caused by his neglect to do so, cannot be recovered of the insurer. 9 Johnson, 21. Ib. 17. 4 Wendell, 45, S. C. 7 Cowan, 504. 1 John. 335. 5 Binney, 595. 7 Howard, 595.

The sale was unnecessary and illegal. The doctrine is well settled, that a sale of goods cannot be made unless in a case of absolute and supreme necessity, such as sweeps "all ordinary rules before it." 1 Arnould, 191. "The power of sale," says Mr. Arnould, Am. ed. p. 198, "however, where the ship is not disabled, or where there exists means of transhipment, must be strictly confined to cases in which the cargo is of a perishable nature, and has suffered so much sea-damage as renders it physically impossible, that if sent on, it can arrive in specie at its port of destination."

"The master is not at liberty, in case of shipwreck, to sell the cargo, merely on the ground that a sale will be the best for all concerned, and that a prudent owner, if present, would sell under the same circumstances, but he will be justified in selling, only by a legal necessity." Ib. 197 (note).

The abandonment must be made within a reasonable time, and what constitutes a reasonable time, depends on the circumstances of each case. Thus, in England, nine days. 15 East. 13; and even five days have been adjudged an unreasonable time. 5 M. and S. 47. *Hunt v. Royal Exchange Association Company.* The insurers and insured in this case, resided in the same city, within five minutes walk of each other.

It is true that Mr. Matthews on July 31, 1851, wrote to the plaintiffs that he had examined the papers, and, considering the proceedings illegal, he could not pay their demand. Supposing that their right to abandon commenced from that date, they still permitted a week to elapse before they abandoned, which was too late, according to the authorities above cited. Hughes, Am. ed. 321, *et seq.* 2 Arnould, Bost. ed. 1175, *et seq.* 5 Mart. N. S. 564. *Mellon v. Louisiana Insurance Company.*

If, however, the court should decide that the plaintiffs have a claim against the defendants, we contend that it can be only for a partial loss. The policy is a valued one, and the mode of adjusting a partial loss, on a valued policy, is fully laid down in 1 Arnould, 309, 310, 311; and the practice in this country, it is believed, universally corresponds with it.

By the court:

SLIDELL, J. The plaintiffs sue for $7500, the value of one hundred and twenty-five bales of cotton, insured by the defendants under a valued policy on

a voyage from Matagorda, in Texas, to New Orleans. The schooner Velasco, in which they were shipped, left Matagorda Bay on the 24th June, 1851, returned to the Bay, on the 26th, in a sinking condition, and, for the purpose of saving the cargo, was beached. The persons who assisted in bringing her in made a claim for salvage, which was submitted, by the captain, to arbitration. A survey was called, and a sale of the cotton recommended. It took place on the 3d July. The net proceeds, after deducting, among other items, thirty-three and one-third per cent salvage, allowed by the arbitrators, amounted to $1177 55. The purchaser of one hundred and twenty-two bales reshipped them to the plaintiffs, in another vessel, which arrived in New·Orleans on the 21st July, 1851. The gross proceeds, at New Orleans, were $3595 71, and net proceeds $3151 32. In the latter part of July, the plaintiffs applied to the defendants for payment of a total loss. The agent of the defendants replied, in writing, that he had examined the papers submitted to him ; that the sale of the cotton and other proceedings were irregular and illegal, and that the claim was consequently not recognized. On the 6th August, 1851, the plaintiffs, by letter, made an abandonment.

In their answer, the defendants resist the claim on the ground of the unseaworthiness of the vessel, and also on the ground that the sale was illegal, and in violation of the terms of the policy.

Upon the latter ground the district judge gave judgment in favor of the defendants, and the plaintiffs appealed.

Our attention will be first directed to the question of seaworthiness. The evidence upon that matter lies within a narrow compass, and consists of the protest, the testimony of the captain, taken under commission, and the testimony of Captain Swain, an inspector for New, Orleans underwriters.

The material part of the protest, which is signed by the captain, mate, and two seamen, is as follows : " That the said schooner being tight, staunch and strong, and having a full cargo of merchandise on board, in the port of Matagorda, bound for New Orleans, they, on Monday the 23d day of June, 1851, having every thing ready and fully prepared for sea at 5 o'clock, A. M. of said day, hove up the anchor, proceeded on their intended voyage, and stood down the bay with pleasant weather, and wind from the N. N. W.; that·at 10 o'clock, A. M. of said day, it became calm, and they came to anchor ; at 1 o'clock, P. M. of said day, the wind having sprung up, they hove up the anchor, and proceeded down the bay ; at 5 o'clock, P. M. they took aboard a pilot to carry them over the swash, and at 7 o'clock, P. M. came to anchor off Ducrow's Point. Tuesday, the 24th June, at·5 o'clock, A. M. hove up the anchor and made all sail, with a fresh breeze from the N. W. and proceeded down the bay to the bar ; tried the pumps and found no water ; at 6 o'clock, A. M. took a bar-pilot on board, and at 8 o'clock, A. M, after crossing the bar, discharged the pilot, and proceeded on their intended voyage with the wind from the E. N. E., making their course towards the S. E. with pleasant weather; at 12 o'clock, M. hove ship, and stood in shore for land ; at 6 o'clock, P. M. being close in land, hove about, and stretched off with the wind from the N. E. Sounded the pump and found no water, and continued on their course until midnight, when they tacked ship, the wind having canted more to the eastward, and increasing; tried the pumps and found no water.

" Wednesday, June 25, 1851. At 1 o'clock, P. M. found the vessel would not steer as she ought to do ; tried the pumps and found they would not suck ; went forward and found the water over the forecastle deck; called all hands

immediately on deck to the pumps, which were kept constantly going, and endeavored to make land, the wind increasing towards the eastward, and the water increasing so fast, that they found that they were in a sinking condition."

At daylight, went aloft to look out for land. Saw a steamship running down. Made a signal of distress, but no notice taken; the vessel at this time being water-logged, and impossible to steer; the wind still increasing, blowing very heavy, and the atmosphere very thick. At 9 o'clock, A. M., made the breakers on the bar, with the signal of distress flying; no pilot appeared; followed the breakers down, looking out for the pass; the sea breaking very high. At length found a place where they thought they would go over, not being certain whether it was the pass, or not; saw a pilotboat inside, but no appearance of any effort made to come to them, the sea all the time breaking fearfully over the bar, and concluded that they could not come to their assistance. Finding no alternative, as the vessel was making water fast, with two men at the helm, and the remainder of the crew assisting steering with her sails, managed to get her through the breakers, in the eastward or old channel, without touching, the vessel leaking fast, with all hands at the pumps. After crossing the bar, the vessel unmanagable, with the Union Jack down, and all their available power at the pumps to keep her from sinking, the pilotboat came off, (the wind having increased to a gale); threw a line on board the pilotboat, for the purpose of towing them on shore; but, the gale still increasing, the rope parted, and the vessel making water faster, though the pumps were constantly kept going. Kept their signal of distress flying, and at half past nine o'clock, Cap. Thomas Ducrow came off from St. Joseph's Island in a small boat, and tendered the services of himself and crew, to bring us into port. Finding themselves in a sinking condition, the water making fast, and the wind still increasing, they accepted his services to bring them into a safe place, where the vessel and cargo could be preserved; and, about 11 o'clock, A. M., with much difficulty, got alongside of Ducrow's wharf, &c., &c.

The captain, who was examined under commission by the plaintiffs, was asked by them, whether he desired to make any explanations or corrections of what was stated in his protest. He answered, that he had nothing to add; that it was correct. With regard to the condition of the ship, he stated that it was good before her departure; that she performed well on previous voyages, as well as any vessel he had been in; and that she was tight, staunch and strong. On his cross-examination he stated, that the vessel was about eight months old, built of white oak, and not coppered; that he saw her bottom last at New York; that she was tight when he boarded her at Matagorda; that she did not leak more on former voyages than vessels usually do; that he did not, when the leak was discovered, find out the cause of it, "but judged it was from distress of weather. After she was discharged, and pumped and bailed out, he found one leak between the mast, and in the centre case."

*Swain* testified, that he was inspector for several of the insurance offices, and well acquainted with the character and class of vessels. That, from the facts detailed in the protest, he considered the vessel unseaworthy at the time she sailed. He assigned as his reasons for that opinion, that the protest showed no bad weather from the time of her getting under weigh, until they found her leaking so fast that they could not keep her free. He also stated, that a vessel not coppered, is liable to be worm-eaten.

Such is the substance of all the evidence before us upon the question of seaworthiness; and the strong impression it has produced upon our minds is, that she was not seaworthy when she sailed.

RUGELY        When a ship becomes so leaky as to be unable to proceed on her voyage, soon
SUN MUTUAL  after sailing on it, and this cannot be ascribed to stress of weather or accident on
INSURANCE Co. the voyage, the fair and natural presumption is, that it arose from causes existing
OF NEW YORK.
before her setting out on her voyage; and, consequently, that she was not sea-
worthy when she sailed. In such cases, therefore, it is incumbent on the assured
to show that, at the time of her departure, she was in fact seaworthy, and
that her inability has arisen from causes subsequent to the commencement of the
voyage. Such is, substantially, the rule, as stated by an able commentator, and
it appears abundantly sustained by the authorities. See Arnould, vol. 1, p. 686.
Phillips 1, p. 324. *Smithen* v. *Memphis Insurance Company*, 3 Ann. 175.
*Talbot* v. *The Commercial Insurance Company*, 2 Johns. 128. *Watson* v.
*Clarke*, 1 Dow. 344.

In *Talbot* v. *The Commercial Insurance Company*, a vessel sailed with a fair
wind and moderate weather, and in the evening of the following day suddenly
sprung a leak, in consequence of which she foundered, without any apparent
cause or extraordinary accident to which the leak could be ascribed. It was
held: that the loss was to be presumed to have arisen from her not being sea-
worthy at the time she sailed. A verdict of the jury in favor of the assured was
set aside, and a new trial granted.

In *Munro* v. *Vandam*, cited by Park, 289, it was held, that if a ship sail upon
a voyage, and in a day or two becomes leaky, and founders, or is obliged to return
to port, without any storms, or visible or adequate cause to produce such an
effect, the presumption is, that she was not seaworthy when she sailed; and
the jury, upon plaintiff's own case, may draw such a conclusion.

The question then is, whether the fair and reasonable presumption of unsea-
worthiness, arising from the facts of the voyage, as exhibited by the protest, is
counteracted and overthrown by the testimony of the master. And we are con-
strained to say, that his testimony has not brought home such a reasonable con-
viction to our minds, as would induce us to believe that some unknown accident
or peril of the sea, and not the defectiveness of the vessel, was the cause of the
leak. We cannot concur with the learned counsel for the plaintiffs, in the
opinion, that this case is as strong as that of *Smithen* v. *The Memphis Insurance
Company*. In that case, it is true, the cause of the accident was unexplained.
But numerous witnesses testified in favor of the seaworthiness of the barge.
The evidence came not merely from the officers and crew of the steamer that
had the barge in tow, but from other reliable sources, such as two inspectors, at
her port of departure, &c. So that the court there characterized the evidence
of seaworthiness, as extremely full and cogent. And it should also be observed,
that the barge was navigating the Mississippi, where there is peculiar danger
from snags, shoals, logs and sand bars; that she was in tow of a steamer, and
that, under all the circumstances, the chances of an external peril being encoun-
tered, without its occurrence being discovered at the moment, were much
greater than in the case of a ship at sea.

We do not pretend to lay down any rule, as to the extent and nature of the
testimony that must be adduced in a case of this sort, to overthrow the reasonable
presumption which the law raises; but the evidence should certainly be stronger
than has been offered in this case. It is proper to add that, in *Cost* v. *The Dela-
ware Insurance Co.*, 2 Washington, 376, Mr. Justice Washington observed, that
if a vessel, after she commences her voyage, becomes unfit to prosecute it, and
has been exposed to no extraordinary perils of the sea, the circumstance may
raise so strong a presumption of her having been *unseaworthy at the time of her*

departure, as to call upon the insured to give strong evidence to repel the presumption.

We feel a reluctance, however, to close the case upon this point against the plaintiffs, for two reasons: The district judge did not act upon it, so that we have not the benefit of his opinion as to the weight of evidence; and the plaintiffs may have been thrown off their guard, in the preparation of this branch of the litigation, by the fact, that the underwriter originally made no objection on that score, to the payment of the loss. We have thought it best, under all the circumstances, to leave the matter open for future inquiry.

The district judge, as we have already stated, decided the case against the plaintiffs on another ground, which we proceed to consider. The policy states: that "in case of the loss of the vessel, or a part of the cargo, or of damage to the whole or part thereof, it shall be the duty of the master to forward such parts of the cargo, as shall be saved in a fit condition to be shipped to its port of destination, by the best conveyance obtainable, at the place where the said goods may be, or at any other place within a reasonable distance, and the enhanced expense, not exceeding the amount insured, shall fall on the insurers."

From the evidence, it appears that the cotton was in a fit condition to be shipped to New Orleans. The means of transportation to New Orleans, could have been had within a reasonable time. There were means of consulting underwriters, and others interested, before selling, and no inexorable necessity that compelled an immediate sale. There was an inexcusable precipitancy, and, as we infer, an inexcusable want of publicity in the time and manner of the sale. There was an inexcusable haste and looseness in the proceedings for arbitration as to the salvage. The recommendation of the surveyors, that the cargo should be sold; the sale of the cargo; the agreement with the salvors. to arbitrate the award, all bear date on the same day, the 3d July, 1851.

In view of these facts, of the well settled principles of law, and especially of the stipulation in the policy, we have no hesitation in concluding with the district judge, that the sale was illegal, the abandonment inefficacious, and the claim for a total loss unfounded.

But we are not prepared to say with the court below, that the plaintiffs are thereby precluded from any relief. If the vessel was unseaworthy, there is of course an absence of all claims for the loss against the defendants. But if she was seaworthy, we see no reason, as at present advised, for the entire discharge of the underwriters, by reason of the failure to forward the cargo. The plaintiffs, it seems to us, would still be entitled to indemnity as for a partial loss.

It is therefore decreed, that the judgment of the district court be affirmed, but without prejudice to the right of the plaintiffs, to sue for a partial loss; the costs of the appeal to be paid by the plaintiffs.

PRESTON, J. In this case, I desire to express no opinion as to the law or evidence with regard to the seaworthiness of the vessel at the commencement of her voyage, but fully concur in the remainder of this opinion.